**KOYO SEIKO CO., LTD. and Koyo Corporation of U.S.A., Plaintiffs,**

**SKF USA, Inc. and AB SKF; SNR Roulements and SNR Bearings, USA, Inc., Plaintiffs–Intervenors,**

v.

**UNITED STATES, Defendant,**

**The Torrington Company; Federal-Mogul Corporation, Defendants–Intervenors.**

Court No. 89–06–00340.

United States Court of International Trade.

June 27, 1991.

Powell, Goldstein, Frazer & Murphy, Peter O. Suchman and Neil R. Ellis, Washington, D.C., for Koyo Seiko Co., Ltd. and Koyo Corp. of U.S.A.

Howrey & Simon, Herbert C. Shelley and Lauren D. Frank, Washington, D.C., for SKF USA, Inc. and AB SKF.

Donovan Leisure Newton & Irvine, Pierre F. de Ravel d'Esclapon, New York City, for SNR Roulements and SNR Bearings, USA, Inc.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Jeanne E. Davidson (John D. McInerney, Sr. Counsel, Douglas S. Cohen, Craig R. Giesse, Diane M. McDevitt, Stephanie J. Mitchell and Maria T. Solomon, Attorney–Advisors, Office of the Chief Counsel for Import Admin., Dept. of Commerce, of counsel), Washington, D.C., for U.S.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr.,

834

David Scott Nance and Geert De Prest, Washington, D.C., for Torrington Co.

Frederick L. Ikenson, P.C., Frederick L. Ikenson, J. Eric Nissley and Larry Hampel, Washington, D.C., for Federal–Mogul Corp.

## OPINION

TSOUCALAS, Judge:

Plaintiffs, Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. (collectively "Koyo"), bring this action for partial judgment on the agency record pursuant to Rule 56.1 of the rules of this Court. Koyo challenges the final affirmative dumping determination of the Department of Commerce, International Trade Administration ("Commerce" or "ITA"), in *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Japan*, 54 Fed.Reg. 19,101 (1989). Specifically, plaintiffs contest the ITA's decision not to create a separate class or kind of merchandise for wheel hub units and unfinished bearing parts. Koyo also claims that petitioner, The Torrington Company ("Torrington") lacked standing to file an antidumping petition on behalf of the domestic producers of wheel hub units, ball bearings and cylindrical roller bearings. Finally, Koyo asserts that unfinished bearing parts should not have been treated under the "alternative reporting requirements."

The Court's jurisdiction is based on 28 U.S.C. § 1581(c) (1988).

### Background

The facts of this case were set out in detail in *The Torrington Co. v. United States*, 14 CIT ——, 745 F.Supp. 718 (1990) and *NTN Bearing Corp. of America v. United States*, 15 CIT ——, 757 F.Supp. 1425 (1991). Briefly, the ITA, in its final determinations, found that antifriction bearings comprised five different classes or kinds of bearings: Ball bearings, spherical roller bearings, cylindrical roller bearings, needle roller bearings and spherical plain bearings. *Final Determinations of Sales at Less than Fair Value: Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the*

*Federal Republic of Germany*, 54 Fed. Reg. 18,992, 18,999 (1989). The bearings were distinguished by their rolling element because the ITA determined that the rolling element established the character of a bearing in that it "determined or limited the [bearings'] key functional capabilities (*e.g.*, load and speed)," which in turn established the limits of the bearings' ultimate use and the customers' expectations. *Id.* Wheel hub units were included within the scope of the investigation, and were classified according to the type of rolling element they contained. In the final determinations the ITA also established that the petitioner had standing to bring an antidumping petition regarding each of the five classes or kinds of bearings. 54 Fed.Reg. at 19,006.

### Discussion

█ A final antidumping determination by the Department of Commerce will be affirmed unless that determination is not supported by substantial evidence or is otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is relevant evidence that "a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938); *Alhambra Foundry Co. v. United States*, 12 CIT 343, 345, 685 F.Supp. 1252, 1254–55 (1988).

### I. Class or Kind

In its petition, Torrington described the class or kind of merchandise at issue as "all ground antifriction bearings and all parts thereof both finished and unfinished with the exception of tapered roller bearings." General Administrative Record ("GAR") (Pub.) Doc. 1 at 13. Commerce deemed it improper to include many different types of bearings within such a sweeping category and thus subdivided antifriction bearings into ball bearings, spherical roller bearings, cylindrical roller bearings, needle roller bearings and spherical plain bearings. GAR (Pub.) Doc. 102. This court, in *Torrington*, affirmed the ITA's

decision to so subdivide the bearings. 745 F.Supp. 718.

Plaintiffs contend, however, that the ITA did not go far enough. In addition to the five classes or kinds, Koyo seeks a separate class or kind category for unfinished bearing parts and another for wheel hub units, which were classified by the ITA according to the type of rolling element they contain.[1]

Commerce's decision to subdivide the petition's single class or kind into five classes or kinds was based on its evaluation of antifriction bearings (except for tapered roller bearings) within the structure of the criteria enumerated in *Diversified Prods. Corp. v. United States,* 6 CIT 155, 572 F.Supp. 883 (1983). Those criteria are: (1) general physical characteristics; (2) the expectations of the ultimate purchasers; (3) the channels of trade in which the merchandise moves; (4) the ultimate use of the product; and (5) cost. 6 CIT at 162, 572 F.Supp. at 889.[2] Koyo asserts that the ITA's analysis was flawed in that it failed to apply the *Diversified Products* criteria to unfinished bearing parts and wheel hub units.

### A. *Bearing Parts*

■ Koyo claims that, since the physical characteristics of unfinished bearing parts are unlike those of finished bearings and since they are not interchangeable in use and require additional manufacturing processes before they become bearings, bearing parts should constitute a separate class or kind than finished bearings. *Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Partial Judgment on the Agency Record* ("Plaintiffs' Memorandum") at 37. The government counters that Koyo failed to exhaust its administrative remedies regarding this issue and is precluded from raising it now because it "abandoned" the issue after having raised it once early on in the investigations. *Defendant's Memorandum* at 128.

■ It is generally required that a party exhaust its administrative remedies prior to raising an issue before this court. However, exhaustion of administrative remedies is required in non-classification cases only where the court deems it "appropriate." 28 U.S.C. § 2637(d) (1988). *See Alhambra Foundry,* 12 CIT at 346–47, 685 F.Supp. at 1255–56.

In this case, plaintiffs "raised" the issue in a letter to Commerce on May 11, 1988, in which Koyo detailed its request that antifriction bearings be divided into eight classes or kinds: "Ball bearings, integral shaft bearings, cylindrical roller bearings, spherical roller bearings, needle roller bearings, housed or mounted bearings, rod end/spherical plain bearings and *parts.*" GAR (Pub.) Doc. 24 at 3 (emphasis added). However, in the long procession of paper which followed until the final determinations were issued on March 24, 1989, Koyo never again either raised this issue or provided any justification for its initial parts category. This includes Koyo's pre-hearing and post-hearing briefs as well as its testimony at the ITA's hearings. Japanese Record ("JR") (Pub.) Doc. 757; GAR (Pub.) Docs. 438, 474.

Since, when given several chances to espouse an argument that parts should be a separate class or kind, Koyo failed to do so, the ITA was not afforded the "opportunity to consider the matter, make its ruling, and state the reasons for its action." *Unemployment Compensation Comm'n of Alaska v. Aragon,* 329 U.S. 143, 155, 67

---

1. There appears to be some confusion on the part of the government and Torrington as to whether Koyo is challenging the class or kind determination or the scope determination, in which Commerce found that wheel hub units were within the scope of the investigations. *Memorandum of the United States in Opposition to Plaintiffs' Motions for Partial Judgment Upon the Agency Record Regarding Certain Fundamental Issues* ("Defendant's Memorandum") at 67; *Memorandum of the Torrington Company in Opposition to Koyo's Motion for Partial Summary Judgment* at 38. It is quite clear to this Court that Koyo has not challenged the decision to include wheel hub units within the scope of the investigations. Rather, Koyo seeks the designation of a separate class or kind for automotive wheel hub units.

2. In this case, the Department used "the manner of advertising and display" instead of cost. 54 Fed.Reg. at 18,999.

S.Ct. 245, 251, 91 L.Ed. 136 (1946). Therefore, the Court finds that plaintiffs failed to exhaust their administrative remedies and are now barred from raising this issue before the Court. Accordingly, the decision not to create a separate class or kind for parts is affirmed.

### B. *Wheel Hub Units*

■ Plaintiffs also contend that the ITA improperly failed to create a separate class or kind for wheel hub units. In its prehearing brief, Koyo argued that wheel hub units should not be subject to an antidumping duty order because a wheel hub unit is "more than a bearing," in that it has different functions from a bearing and its manufacturing process differs from that of a bearing. JR (Pub.) Doc. 757 at 16. Thus, Koyo used the *Diversified Products* criteria to contend that wheel hub units constitute a separate product, *i.e.*, class or kind, than antifriction bearings.

When the ITA made its class or kind analysis, it reviewed the totality of bearings and found that they should be segregated on the basis of their rolling element. This determination was affirmed in *Torrington*. While Commerce conducted a top-down class or kind analysis, Koyo seeks a bottom-up determination as to its particular product. That is, Koyo wants the ITA to look at wheel hub units and find that they constitute a separate class or kind. The record reveals that Commerce did consider the distinctions inherent within each of the classes or kinds when it made its class or kind determination. GAR (Pub.) Doc. 102. However, the ITA concluded that the type of rolling element was what gave a bearing its character and thus the bearings were classified accordingly. 54 Fed.Reg. at 18,999. In the event, the ITA found that wheel hub units, while different in some ways from ordinary ball bearings, merely were enhanced ball bearing units "modified in ways similar to other bearings which have flanged or otherwise enhanced parts containing raceways." *Id.* at 19,014.

Since the ITA's class or kind distinctions were based on the rolling elements and their various load and speed capabilities, and since no evidence was submitted to show that the load and speed capabilities of wheel hub units differed from those of other mounted bearings in their assigned classes or kinds, the decision not to create a separate category for wheel hub units was consistent with Commerce's analysis of the issue. In light of this court's affirmance of Commerce's decision to subdivide the bearings on the basis of their rolling element, the Court holds that the decision not to create a class or kind for wheel hub units was reasonable and was supported by the evidence in the record and is affirmed.

## II. Standing

■ Koyo also challenges the determination by Commerce that Torrington had standing to file an antidumping petition on behalf of the domestic industries which produce ball bearings, cylindrical roller bearings and wheel hub units. The statutory requirements for initiation of an antidumping proceeding by petition are that "an interested party ... files a petition with the administering authority, on behalf of an industry, which alleges the elements necessary for the imposition of the duty imposed by section 1673 of this title, and which is accompanied by information reasonably available to the petitioner supporting those allegations." 19 U.S.C. § 1673a(b)(1) (1988).

In *NTN Bearing*, the court affirmed Commerce's conclusion that petitioner herein possessed standing with regard to ball bearings, spherical roller bearings, cylindrical roller bearings, needle roller bearings and plain bearings. 15 CIT at ——, 757 F.Supp. at 1431. Concerning Koyo's challenge to Torrington's standing in the ball bearings and cylindrical roller bearings industries, the Court adheres to its opinion in *NTN Bearing*, and finds that Commerce properly determined that petitioner possessed standing to file an antidumping petition on behalf of those domestic industries.

Since wheel hub units are not a separate class or kind of merchandise, the Court need not inquire as to whether Torrington filed the petition on behalf of wheel hub unit manufacturers, as they do not com-

prise a separate industry. However, Koyo also bases its challenge to Torrington's standing on the issue of whether Torrington is an interested party. To have standing, a petitioner must be an interested party, that is, "a manufacturer, producer, or wholesaler in the United States of a like product." 19 U.S.C. § 1677(9)(C) (1988). Plaintiffs assert that petitioner is not an interested party because it does not manufacture wheel hub units and therefore did not have standing to file the petition regarding wheel hub units. *Plaintiffs' Memorandum* at 29.

There is no dispute that Torrington does not manufacture wheel hub units for automotive use. Torrington admitted as much several times during the investigation. *See* GAR (Pub.) Doc. 49 at 7, Doc. 438 at 175–76; GAR (Conf.) Doc. 36 at 18. However, Torrington does produce wheel hubs for other products, such as machine tools and aircraft. GAR (Pub.) Doc. 49 at 7; GAR (Conf.) Doc. 36 at 18. Also, the ITA found that wheel hub units merely were enhanced ball bearings, which Torrington does manufacture. 54 Fed.Reg. at 19,014. Therefore, Torrington was a producer of like products and was entitled to file a petition which included wheel hub units. 19 U.S.C. § 1673a(b)(1); 19 U.S.C. § 1677(10) (1988).

Accordingly, the Court holds that the ITA properly concluded that Torrington had standing to file an antidumping petition which included automotive wheel hub units, provided those units fit within one of the five classes or kinds of bearings distinguished by Commerce.

### III. Alternative Reporting Requirements

 Lastly, Koyo argues that the ITA's failure to compare U.S. and home market sales of bearing parts, and its application of the margins for finished bearings to bearing parts, were not in accordance with law.

Due to the tremendous number of transactions involved in these investigations, the ITA adopted alternative reporting require-

ments to simplify the tasks of both the respondents and of Commerce itself. 54 Fed.Reg. at 19,027. The Tariff Act of 1930, as amended, provides that, whenever a significant volume of sales is involved or a significant number of adjustments to prices is required, the ITA may "use averaging or generally recognized sampling techniques" to determine the U.S. price or foreign market value of the subject merchandise. 19 U.S.C. § 1677f–1(a)(1) (1988). These averaging or sampling techniques must be "representative of the transactions under investigation." 19 U.S.C. § 1677f–1(b) (1988). *See also GMN Georg Muller Nurnberg AG v. United States*, 15 CIT ——, ——, 763 F.Supp. 607, 612 (1991); *Asociacion Colombiana de Exportadores de Flores v. United States*, 13 CIT ——, ——, 704 F.Supp. 1114, 1121 (1989), *aff'd*, 901 F.2d 1089 (Fed.Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 136, 112 L.Ed.2d 103 (1990); *Floral Trade Council of Davis, Cal. v. United States*, 12 CIT 1163, 1167, 704 F.Supp. 233, 237 (1988). Commerce's regulations also authorize the ITA to simplify the reporting requirements of respondents by varying the percent of the volume of exports examined and/or the period from which pricing information is submitted. 19 C.F.R. § 353.38 (1988).

Commerce in this case simplified the reporting requirements by, *inter alia*, asking the parties to report their sales data only on *finished* bearings manufactured from imported bearing parts in each of the five classes or kinds, as sold to the first unrelated buyer in the United States. 54 Fed.Reg. at 19,028. Hence, only data pertaining to finished bearings was used for the less than fair value ("LTFV") calculations and the resulting margins were applied to parts as well as to finished bearings. Koyo contends this methodology yielded unrepresentative results and inaccurate margins, since in calculating the price of imported bearing parts, Commerce did not deduct the value added in the United States from the exporter's sales price, as required by statute.[3]

---

**3.** The exporter's sales price is "the price at which merchandise is sold or agreed to be sold

in the United States, before or after the time of importation, by or for the account of the export-

In exporter's sales price transactions, as the instant ones were, the exporter's sales price of the merchandise is to be reduced by the amount of "any increased value, including additional material and labor, resulting from a process of manufacture or assembly performed on the imported merchandise after the importation of the merchandise and before its sale to a person who is not the exporter of the merchandise." 19 U.S.C. § 1677a(e)(3) (1988).

The government argues that the ITA was not required to deduct value added from the exporter's sales price because Commerce concluded that the comparisons of the prices of finished bearings "would provide a reasonable estimate of the dumping margins" which would have been computed if Commerce had deducted the value added and compared the prices of the components. *Defendant's Second Memorandum in Opposition to Plaintiffs' Motions for Partial Judgment Upon the Agency Record Regarding Certain Fundamental Issues* at 30. The ITA also reasoned that this alternative methodology would serve to expedite the proceedings and "reduce the reporting burden on respondents." 54 Fed.Reg. at 19,028. In addition, Koyo presented no evidence that the margins would have been different if parts prices had been compared independently. *See Asociacion Colombiana*, 13 CIT at —, 704 F.Supp. at 1122.

This court has acknowledged that Commerce has "great flexibility" at the investigatory stage of an antidumping proceeding. *Southwest Fla. Winter Vegetable Growers Ass'n v. United States*, 7 CIT 99, 107, 584 F.Supp. 10, 17 (1984). Though this does not mean Commerce retains the right to issue determinations by fiat, a significant degree of deference to the ITA's interpretative role is envisioned in the Tariff Act. *See Mitsubishi Elec. Corp. v. United States*, 12 CIT 1025, 1042, 700 F.Supp. 538, 552 (1988), *aff'd*, 898 F.2d 1577 (Fed.Cir. 1990). In the present case, the ITA used its discretion to compare only the prices of U.S. and home market finished bearings in

order to relieve the onerous task of both respondents and of Commerce itself. In light of the immense amount of sales faced by Commerce in these investigations, that decision was reasonable and could be expected to yield a relatively accurate estimate of the dumping margins of bearing parts. Thus, the Court finds no error in the ITA's decision to apply the margins for completed bearings to bearing parts without deducting value added in the United States.

Given the unique complexity of the bearings investigations and the vast volume of sales involved, as well as the pressure on the ITA to complete the investigations within the statutory deadline, the Court finds that the streamlined procedure adopted by the ITA in this case was reasonable and was in accordance with law. It was fair to assume that finished bearings would have margins that were representative of the margins of unfinished bearing parts, particularly since no evidence was submitted to indicate otherwise. Therefore, the determination of the ITA to use the simplified methodology employed in this case is affirmed.

### Conclusion

The Court finds that the determination by Commerce that bearing parts and wheel hub units do not constitute separate classes or kinds of merchandise was in accordance with law and is affirmed. Also, the Court adheres to its opinion in *NTN Bearing* and finds that Torrington had standing to file an antidumping petition on behalf of the domestic ball bearings and cylindrical roller bearings industries.

Lastly, the Court finds that the treatment of bearing parts under the alternative reporting requirements was in accordance with law and is affirmed.

### JUDGMENT

Plaintiffs having moved this Court pursuant to Rule 56.1 of the rules of this Court for partial judgment upon the agency record, and the Court, after due deliber-

er, as adjusted under subsections (d) and (e) of this section." 19 U.S.C. § 1677a(c) (1988).

ation, having rendered a decision herein; now then, in accordance with said decision,

IT IS HEREBY ORDERED that plaintiffs' motion for partial judgment upon the agency record as to Counts 2, 3 and 4 of plaintiffs' Complaint is denied, and those counts are hereby dismissed; and it is further

ORDERED that the determination of the Department of Commerce, International Trade Administration, in the above-captioned case, regarding Counts 2, 3 and 4 of plaintiffs' Complaint is affirmed; and it is further

ORDERED that pursuant to Rule 54(b) of the rules of this Court, this is a final judgment as to Counts 2, 3 and 4 and there is no just reason for delay in the entry of a final judgment.